Mitchell v. Kallas, Jr. May it please the Court, Nicole Jacobowski on behalf of the Plaintiff Lisa Mitchell. The Plaintiff asked that this Court reverse the grant of summary judgment to defendants in this case because the record shows that they exhibited deliberate indifference to  She entered DOC custody in 2011 already with a diagnosis of gender dysphoria. Can I ask you whether your primary focus is on the length of time it took for, you know, the Osborne assessment and all this for somebody finally to decide that she needed the hormone therapy? Then obviously we run into this policy about six months before the end. Or is your focus on the parole agents who didn't follow through? And in fact, according to the allegations, as I understand it, were preventing her from presenting as a woman. What's your main focus here? So I think that the main focus of the briefing was on the delay. And then followed by the decision to deny her treatment after the report came through and said she was an excellent candidate for hormone treatment. With that said, my client does very strongly feel that she would like her day in court to litigate the allegations against the parole officers. The district court allowed that path to be open, right? The district court, as I understood the order, the screening order, simply severed those claims and dismissed them without prejudice. So I think initially, I think there were a number of rationales given. The issue was raised numerous times by her in the district court. Initially, I believe that the dismissal was that she had not adequately pled it. And I think that that is contradicted by her fair reading of her complaint. Later, the district court then, in a motion to reconsider, said, well, she could bring this in a separate action. Right. And I think that she understands that, but that she hoped to exhaust this appeal first. And so if possible, she would prefer to bring it all in one case and have all of those issues. I understood exactly what the district court did there. Did the district court dismiss them then? I mean, it's one thing to sever the claims, and it's another to dismiss them. The district court had a right probably to sever the claims, but I understood the district court dismissed it. That's correct. Dismissed it. And in a later opinion said that she could bring it in a separate action. So this all relates to a line of cases that we've had about how broadly one is to read Rule 20, because there certainly have been prisoners, Mr. Owens is a repeat offender on this, who file 75 claims against 44 people in three different prisons and so on, and we've said to the district courts, you need to make sure that this case is really all about the same thing. So I understood you to be arguing that the district judge here took that idea too far, that the claims against the parole officers, while somewhat distinct in time, are really so linked to the complaints against the doctors at the facility. It's really the failure to take that diagnosis. It's the failure to follow up and pick up where things left off, that it's your view that Rule 20 says that this really is still the same transaction occurrence, et cetera. That's correct. There was a direct line. There's almost no time that elapsed between the decision that was made to deny her hormone, the receipt of the report, the decision made to deny her hormone treatment. She was released, and then she immediately went into these parole conditions. But isn't it a risky strategy? I mean, the district judge dismisses without prejudice. Wisconsin has the longest statute of limitations for these claims in our circuit, but even six years elapses at some point. Why wouldn't the prudent thing to do, I know it's another filing fee, but just file the other case against the parole officers, maybe even move to consolidate if you want to see what the district judge thinks? So I certainly agree with that. My client represented herself below. I've been appointed only for purposes of this appeal. Yes, and we appreciate that. I was going to tell you that at the end, but I'll tell you now. I certainly agree with the court's point of view on that point. But which is to say that, again, that the argument is you characterized it correctly, that it is all a part of the same transaction and occurrence. She provided a copy of the Osborne report to her parole officers as soon as she was released, and so they saw the recommendation that she receive hormone treatment, that she be permitted to live as a woman, and importantly that this would reduce her odds of recidivism. And yet her allegation is that they prohibited her from seeking treatment, forced her to dress and present as a man, and thereby hindered her necessary medical treatment. Does the state owe a duty of medical care to persons on parole? The law is not as clear as it would ideally be. You think ideally it should be obligated to provide medical care at state expense to people on parole? It's not provide medical care. It's an obligation not to stand in the way. That I understand. I understand that theory. Okay, thanks. So because I had a similar question, I was thinking that the rationale of Estelle against Gamble with respect to medical care in the prison is you're in prison. You can't just say, hey, I have a doctor's appointment this afternoon, and go leave and go see the doctor of your choice. And so the quid pro quo is the prison has to give you acceptable medical care. And so we have plenty of litigation about whether that's happened or not, and that might be your delay claim. But once you're out on some form of parole or supervised release, I wonder if the rationale falls apart a bit, because it might depend on the conditions of release. If you're in a halfway house where you are, in fact, not free to go to your doctor's appointments or to whatever else, maybe the rationale still holds up. If you are on a more liberal form of release, whatever that may be, maybe you can go to your job and you can go around and you just have to check in with your probation officer once a week and promise you didn't leave the jurisdiction or whatever. I don't know why those people fall within the rationale of Estelle. Maybe you can help me. So, and again, I don't think that the claim here is, I think all of what you said is correct. And I think that it's not a claim that they needed to, that the parole officers needed to provide her medical care or ensure that she received it. It's just that they can't stand in her way from seeking it. Don't block it. And don't impose conditions of parole that make that medical care impossible. You know, they force her to show up every week, even now, dressed as a man. And so she's taken to wearing, you know, the same outfit every time so that she doesn't get a hassle when she shows up. Although she is trying to live as a woman to the extent possible and without violating her parole. Apart from the dress issue, did they do anything else? I mean, you said they forced her to live in a halfway house for men. Correct. But did either of those actually prevent her from getting treatment or was there anything else? So I believe it was a homeless shelter for men, if I remember correctly. And then forced her to dress in a certain way. You know, the complaint is handwritten and does not contain a huge amount of detail. But my understanding is that her claim is that they told her that she could not seek this treatment. And so they stood in the way of her actually seeking out hormone treatments or transitioning to it. So that sounds like they may have some control. I mean, that would tend to make me think there is an Eighth Amendment dimension here. Because if they have the ability to say to her, we are going to block your access to a certain form of medical treatment, then she's not in the same position as just a normal citizen who's wandering around with no restrictions. Hasn't there been some administrative litigation involving the parole agents, though, where the ALJ came down pretty strongly in favor of Ms. Mitchell and told them to knock it off? Yes. Essentially, that is the case. That's a paraphrase of the ALJ's decision. That's correct. My understanding is that it has not had an effect on the way that they have been treating her. Okay. Could we go back to the claims that were actually decided on the merits here? And in particular, the delay claim. You say in your brief at page 17 that large portions of this delay are traceable to a lack of DOC resources and the absence of DOC policy or else are unexplained by the record. And the lack of DOC resources and absence of DOC policy under our 1983 regime of individual liability seemed difficult to pin on Dr. Callis and Dr. Lauren individually. Could you address that concern? So I think that even against that backdrop, that the information that they had and the actions that each of them individually took showed a deliberate indifference to the unreasonable delay here. I think that Dr. Callis was personally aware of her request, facilitated the brief internal review of it, and then referred it to Ms. Osborne, the outside consultant. He retained the ultimate responsibility here. We know that Ms. Mitchell reached out to him in several letters during that interim period of the Osborne report because we have his October 8, 2012 letter back to her, which references multiple letters, and very interestingly references that the report is almost complete and it should be just a few days. That suggests I think the reasonable inference there is that he had a fair warning at that point of how it was going to come out. It seems a little weird that Ms. Osborne, who's not even a psychologist and over in Baltimore, is the only person in the United States who does this. Correct. And I think that there's nothing in the record to support that assertion. There's no suggestion that anyone at the DOC tried to find someone more local, someone who had more time to devote to Ms. Mitchell. And then with respect to Dr. Laurent, she met with Ms. Mitchell individually. There's a dispute in the record actually about exactly what happened at that meeting. Ms. Mitchell says she complained to her that there was this delay. She certainly had responsibility to review all of the psychological and psychological treatment notes, which I encourage you to read through because they really show the deterioration of her mental condition over time and reinforce just the lack of urgency within the DOC about this situation. She was getting counseling every week. I don't think that that counseling can fairly be read to be targeting or dealing with her gender dysphoria in any way. I think mostly what you see in the notes is her complaining that she's remaining untreated. And then you also see a lot of references to her PTSD, to her nightmares, to her other mental illnesses, but I think that they do not show treatment of her gender dysphoria. So at what point would you say there was deliberate indifference? The truth is outside of prisons it can take a long time to get a bunch of tests and get treatment started. Yeah, what's interesting here is that they never actually started on those physical tests. That's another issue. And so this whole delay was associated with just determining if she would be a good candidate for it. You know, reading the Osborne report, and honestly there's not a single fact in there that suggests that she isn't, and so it's not clear to me why it took so long. There's obviously it's difficult to draw a bright line and say, you know, X number of months is acceptable and Y is not, but there's no support in the record showing that it was reasonable to allow this to languish for so many months. All right, thank you. If you wanted to say anything. I wouldn't. Thank you. Mr. Roth. Good morning, Your Honors. I'm Assistant Attorney General Colin Roth here on behalf of FLE's Dr. Kevin Callis and Dr. John Loring. So, Mr. Roth, can I direct your attention to a phase that we haven't focused quite as much on, and that is once Osborne finally produces this report, if I remember, it's around November, and she's due to be released in January, and so they all just say, well, it's too late, you know, because we're not going to have the six months that we need to get this started. So I have some hypotheticals for you. Suppose instead of gender dysphoria, she had been diagnosed with a thyroid condition, which can be very serious for people, and it can require medication that needs adjustment over time. It's a very delicate hormonal mechanism, not unlike the gender dysphoria one. Do you think the prison would be entitled to say, well, too bad, sorry you have this thyroid condition, but because you're going to be released, we're not even going to start. We're not going to have any provision for a handoff from the inside the prison medical care to the outside of the prison medical care. Your Honor, I have a feeling your reaction to my response is going to be that I'm dodging the question, but I think there's nothing in the record here about thyroid conditions, so it's hard to say. Well, then you're not getting the gist of my question. I'm going to give you thyroid condition, I'm going to give you diabetes, I'm going to give you high blood pressure. There are many conditions that are serious medical conditions that require medication that needs tweaking. Indeed, bipolar disorder, it's very unclear which drug is going to work and how much of the drug. Many conditions like that, and if the position of the Wisconsin prisons is, anytime somebody has a condition for which the medication needs to be adjusted over time, isn't entitled to any medication at all if this need becomes apparent within six months of leaving the prison, I'd have a really hard time with that. Diabetes, it could even be lethal if you're not getting some form of treatment. You could go into insulin shock, you could do things. And so I'm trying to make it clear that what's happening to her is really just an example of a general problem. And if the Wisconsin prisons just drop the ball, then that sounds like deliberate indifference to me. I think there's two parts of the decision here. So I think you're referring to it may take a while to land on proper dosage to... We figured out that you're a great candidate for this, but because you're going to be released from prison sometime in the next six months, we're just going to kick you to the curb, basically. We're not going to start. And I have a real issue with that because it seems to me there are many, many medical conditions where you just have to start, and if the successor physician thinks that some adjustment is necessary, then that's what the successor physician will do. So I think there's two things. One is the amount of time it takes to land on a dose that achieves the optimal positive results. So for diabetes, adjusting your blood sugar level, it may take a while to figure out what dose is going to be most effective to do that. Right, so you think it's just fine not to treat the diabetic person if they're going to be released in six months. Well, what I was going to say is there's the flip side of that, which is the negative side effects of continuing a particular dosage without the proper monitoring. Why is the prison not going to monitor until the day the person leaves? Well, the issue is not whether the prison monitors, but the issue is whether if the prison gives Ms. Mitchell, say, a six-month prescription for these kinds of hormones, she has only a month left, she starts taking the hormones in prison, the prison monitors her during that month. Why do they give her a six-month prescription? Why not a prescription that lasts a couple of weeks into the period of release to give her time to find a doctor and tell the parole officers, by the way, that they have to help her do that, not stand in the way of it? Well, sure. I mean, I think it's unclear whether two weeks of hormones before her release would really do anything. No, I'm saying, you know, so let me find the dates. One place it says one month and in another it says a couple of months. Yeah. Osborne's final report is received by DOC on December 2nd. They get a draft November 15, they receive it December 2nd, and she's released in January, I believe, of 2013. So let's just say roughly six weeks to two months later. So you treat her during that six weeks to two months and you give a little bit of a bridge into the release time. That's where the two weeks comes in. You treat her, if it's four months, you treat her for four months. If it's one month, you treat her for one month. But just as you would certainly treat a diabetic, you'd treat somebody with thyroid condition, you'd treat somebody with high blood pressure, which can lead to stroke and can also be fatal. You treat the person. You don't just say, oh, well, you're going to leave, so we get to ignore you. Well, I don't think it's... it was not a statement that we're going to ignore you. I mean, I think it's clear that DOC was... But it is once they knew she was a good candidate for hormones. Well, DOC, what they did say is both Dr. Osborne and Dr. Callis offered to assist Ms. Mitchell when she went out into the community. But not to give her anything while she was still in the prison. Well, she was receiving... She can't get around that. She's not given a single hormone treatment when she's still in the prison. Well, that's true. Right, and that's what she needed. Well, in Dr. Callis' medical opinion, it would have been unsafe and irresponsible to begin her on the hormone treatment, let her continue the hormone treatment without the proper monitoring. Well, but why is he assuming that there's no monitoring? Why... there's no medical profession outside the prison? How can that be? And again, would he have said that if it was diabetes? I bet not. Well, I don't know if diabetes carries the same potential adverse side effects. It does. If you have too much insulin or too little insulin, trust me, it does. So, I mean, I think the only evidence in the record here is Dr. Callis' medical opinion. Now, I understand that Ms. Mitchell would have preferred to receive the hormones a month before her release. But you sound like she'd prefer to have an ice cream sundae instead of a piece of cake. That's not really preference that we're talking about. She has been trying since the day she entered this prison to drill home the fact that she is a transgender woman and she needs medication to help her deal with this fact. Right? I mean, you knew when... the day she came in, you knew this. Well, the day she came in, what DOC knew is that she had a diagnosis of gender dysphoria. What DOC did not know is how best to treat that diagnosis. Now, there are cases where patients come into DOC custody with an existing prescription. And yes, there is some duty when a patient comes in with that prescription to continue the prescription or try to get it on the approved formulary if it's not already, etc., etc. But that's not the situation here. All DOC knew when she entered custody was she had this diagnosis. And I think it's very clear from the record and the standards of care that we reference that there's no single treatment that you necessarily need to receive for gender dysphoria. Some patients need hormone treatment. Others need to take a step further to reassignment surgery. But some don't need either one. So why does it take them 14 months to figure out what she needs? She comes into the prison October 11, 2011, and DOC has the final report in December of 2012, 14 months later. Is it really that hard? I mean, DOC has a policy of how it handles these requests to make sure it does the right surgery. What if it took it five years? Would that be just as fine with you? Well, you know, I can't say. It really depends on the facts of the case. Remember, this is a case about personal liability for Dr. Kallis, who is the mental health director for the entire DOC. So for Ms. Mitchell to survive summary judgment, she needs to show that he was deliberately indifferent. His individual state of mind was, I know she needs this treatment, and I'm not going to give it to her. Which is why I was focusing on that final period. By that time, he knows that she needs the treatment. No one disagrees with that. There's no dispute of fact whatsoever as of December 2012 that she's a good candidate. Osborne says so. Everybody else thinks so. No one's contesting that. But he decides to leave her untreated. He decides, based on his medical judgment, to leave her untreated. And I think that falls into the classic category of disputes over medical judgment are not the greatest of Eighth Amendment claims. How is it a medical judgment to deny treatment, given the report that says she needs it? The medical judgment, again, it's that we cannot stabilize her on the proper dose, a safe dose, and monitor her to ensure she doesn't experience the adverse side effects. Cardiovascular problems can result if you have the wrong dose of these hormones. And it's not clear that you can even receive the effective treatment in a month. You may not be able to find a dose that's even close to one that is what she needs. Is two months enough? Well, in the record, at this time, DOC's approach was to require six months in custody to arrive at the proper. So somebody who has five months left to go, who is in his mental condition is deteriorating on just sort of week to week, it's observable, can be given no treatment during that period because the prison doctors can't be confident about continuity of care after discharge. That's the theory. That is trouble. That was the general DOC policy that Mr. Callis, Dr. Callis referred to at the time. I think what's important is on these facts, this is not a case about equitable relief with respect to a DOC policy. This is a case with respect to Dr. Callis' individual medical judgment about this particular patient. It sounds like he wasn't making a medical judgment. He was making an administrative judgment that the policy says six months, she's going to be released within six months, don't do anything. That's not a medical judgment. Does the policy say six months? I thought the written policy was silent on that. There's no. DOC does have a treatment policy, a promulgated policy that's written down, and the six-month period was not in this policy. Now I think whether it's in the policy or not is though I think it's really a bit of a red herring here. I mean the issue is whether with respect to Ms. Mitchell, whether Dr. Callis had some medical justification for the decision he made. It's not just that he looked at the policy and said, oh, the policy says six months. I'm applying the policy without thinking about it at all. In Dr. Callis' declaration, he provides medical justification for the decision he made, and I think without any countervailing expert testimony or anything in the standards of care from the World Professional Association of Transgender Health Professionals doesn't say anything about how quickly this treatment needs to begin. I mean there's no countervailing evidence in the record that shows. Except the fact that she's deteriorating. There is countervailing evidence that she is deteriorating. Well, there is evidence in the psychological treatment notes that she's expressing some mental discomfort, admittedly. Again, this is a case about individual liability. There's no indication that Dr. Callis personally knew that she was facing substantial risk of harm based on this, not giving her the hormone treatment in the last month. And even if he knows of these generic risks, I mean, I think he's entitled as the DOC Mental Health Director with, and he does have ultimate authority over these treatments, to render a medical judgment about what is appropriate in these kinds of situations. Now, if there was some doctor came in and said, well, this has no medical basis whatsoever, that would be a different case. But that's not what we have here. Of course she was pro se. Talk to me a little bit about the parole agents who seem to me to have very badly served her. Sure. Well, what I would say is that is a different, I think that's a different case. I don't think so. How can you even know where to draw the line between this case and that case? This all arises out of the prison's confirmation of her diagnosis. Osborne's report, which is handed from the prison over to the parole agents, and they take their marching orders from there. They should have, except they didn't. They won't even let her dress as a woman. It's true that this all, in some sense, at some level of generality, does relate to her transgender dysphoria. A very close level of relation. Well, what I would say is the case that was litigated to summary judgment is about the duties and responsibilities of medical professionals, supervisory medical professionals, with respect to the health care of inmates within DOC custody. Of this very condition. Well, that's true. And when the rationale for not treating her is because she needs to be treated once she's outside. Well, I mean, I think as was addressed in the opening presentation, the Seventh Circuit has not resolved whether parole officers have these kinds of duties at all. I mean, that's a very separate issue to, can Dr. Callas, in his supervisory role as the mental health director for the entire DOC, be held personally liable for his treatment decisions? Well, but what about the parole officers, too? That's what I'm saying. I think the parole officers, it's a different. They're not derivative of Dr. Callas. They have their individual responsibility. Well, I understand that, but it's resolving their individual responsibilities, and whether they have Eighth Amendment duties at all to individuals on parole, that's unsettled. And I think the standard is abuse of discretion, whether the district court abused its discretion by severing these cases. They could have gone forward in another lawsuit, and they did not. So I think given that standard of review. Well, she wouldn't have had to have filed, as the district court did it. She was going to have to file a new lawsuit. Correct, and she didn't. And it's all tied to this Osborne report. Only in the sense that it relates to her gender dysphoria condition and whether to institute or retreat. Well, that's like the whole case, though. You're saying only insofar as the whole case is concerned. Well, I think there's two very different parts of this case. What are the duties of a supervisory DOC official who is a medical professional? But that would be true if you had a prison guard beating somebody up, and then they got taken to the medical unit and the treatment in the medical unit was unsatisfactory. That would be one case. Even though the duties of the prison guard not to be abusive are different from the duties of the doctors to provide decent medical care. But you would not have any hesitation saying that was one appropriate case. And this is true the same. Okay, the doctors have certain duties. The parole officers have certain duties. But it's all one fact pattern. Well, I think the differences in the fact pattern are when Ms. Mitchell was in DOC custody, the case really focuses on the length of this evaluation period and the ultimate decision to deny treatment. I mean, those are, you know, what happened? Where was the report? What stage was the report process at during her period of incarceration? You're reading her pro se complaint very tightly, I'm going to say. I mean, again, I think I'd say the district court has broad discretion over how to handle these types of claims and whether to sever them. The very last thing I would say, and I think I'm over my time and I apologize for that, is I think this case is really a classic one for qualified immunity for Dr. Callas. I mean, I think there's no authority that states, I mean, typically the rule is supervisory individuals like him. Again, he runs the entire mental health unit for all DOC institutions. Individuals like that essentially rarely face personal liability for the acts of either subordinates or other folks who are providing direct clinical care. I mean, I think it's- I didn't see qualified immunity with respect to the parole officers. Your brief- Oh, sorry. No, no. I'm talking about- I know you're talking about Dr. Callas. I'm thinking of the parole officers right now. And you have two pages and a little bit all about Rule 20, but you don't say that they're entitled to qualified immunity. Right. We didn't make that argument in our brief. We relied on the district court's wide discretion in determining which claims go forward. All right. Well, thank you very much. Thank you. I appreciate your point. Ms. Jakubowski. Just very briefly, Your Honors. I just wanted to address the point that counsel said about the WPATH guidelines which underlie the DOC's policy saying nothing in this circumstance. And I think that that's untrue. I think that the guidelines are very clear that, you know, the grave danger that Ms. Mitchell faced in having completely untreated gender dysphoria for this period of time. I think also as referenced in the brief, there's a reference to the possibility of bridging hormone treatment, which is I think what this court has been talking about where they would put her on an initial dose and then coordinate with an outside doctor in order to ensure that over that transition when she left the prison that she could reach an effective dose without any side effects. Prison health care is challenging enough in prisons, and we see plenty of those issues. But it also can be very, very challenging for somebody who's just been released from prison, even without obstacles from parole. Can DOC – first of all, what do we know about Ms. Mitchell's access to health care of this kind of specialized care after her release? And can the – can DOC officials take that into account? Well, I think that there's nothing in the record about her access to treatment afterwards, but I will say that the report – Dr. Callis' letter and Dr. Osborne – or Ms. Osborne's report themselves bring up this notion and seem to assume that the prison could work with her in some capacity in order to – They encourage her to pursue such treatment. Exactly, exactly. What about the qualified immunity issue with respect to the prison official? So with the qualified immunity issue, I think that the way I think about it is really breaking down into the fact that even if the medical understanding of gender dysphoria or its treatment and certainly the public understanding of it has been changing rapidly, the legal framework that these defendants have to operate within has not been changing. And the precedent makes very clear that an individual should not face any unreasonable delay in the treatment of a serious medical condition. There are numerous cases out there suggesting what an unreasonable delay is in a variety of contexts. And then there are also cases making the point that psychological maladies are to be treated just as seriously as physical ones. And so I think all of that adds up to reasonable warning of what the responsibilities were in this case. All right. Well, thank you very much, and thank you again for accepting our request that you represent your client. We appreciate it. Thanks as well to the state. We'll take the case under advisement.